UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ADAN AYALA,

<table>
<tr><td>Plaintiff,</td><td>16-cv-1541 (PKC)</td></tr>
</table>

     -against-                              MEMORANDUM
                                                       __AND ORDER__

CAROLYN COLVIN,
ACTING COMMISSIONER
OF SOCIAL SECURITY

                                   Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

         Plaintiff Adan Ayala appeals the decision of an Administrative Law Judge

("ALJ") that denied his application for Supplemental Social Security Income ("SSI") under Title

XVI of the Social Security Act, 42 U.S.C. § 1381.  Ayala alleges he is unable to perform work

because of his depression and left ankle pain and sprain.  (Compl.¶ 4.)  Ayala brings this action

pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. Section

405(g), to challenge the final decision denying his application for SSI.  (Compl. ¶ 1.)  Plaintiff

asserts the decision of the ALJ affirmed by the Appeals Council was "erroneous and unfounded."

(Compl. ¶ 14.)

         Both the plaintiff and the Acting Commissioner of Social Security (the

"Commissioner") have filed motions for judgment on the pleading pursuant to Rule 12(c), Fed.

R. Civ. P.  For reasons set forth below, defendant's motion for judgment on the pleadings will be

granted, and plaintiff's cross-motion for judgment on the pleadings will be denied.

## I.   PROCEDURAL HISTORY

Plaintiff was previously denied SSI benefits on October 9, 2012 by the Appeals Council.  (Administrative Record of Proceedings ("R.") 170.)  He applied for SSI again on November 26, 2012, alleging he became disabled and unable to work as of September 24, 2012.  (R. 44.)  His application was denied by the Social Security Administration on February 28, 2012, to which Ayala timely filed a request for a hearing before an ALJ.  (Compl. ¶ 7.)  A hearing was held on May 27, 2014 where Ayala appeared with his attorney and testified before ALJ Elias Fever. (Compl. ¶ 8.)  Vocational expert Andrew Vaughn was also present and testified at the hearing. (R. 81-85.)  ALJ Feuer issued a decision on July 23, 2014 finding Ayala was not disabled and therefore not entitled to SSI.  (R. 41.)  Ayala requested review of the ALJ's decision by an Appeal's Council and submitted new medical evidence to be included in consideration.  (R. 36.)  The Appeals Council denied the request to review the claim on December 30, 2015, making the ALJ's denial of benefits the Commissioner's final decision.  (R. 2.)

Ayala appealed the Commissioner's decision asserting that the ALJ's findings are not supported by substantial evidence.  (Compl. ¶ 14.)  Ayala asserts that (1) the ALJ did not give proper weight to the medical testimony of the treating physician; (2) the ALJ failed to properly evaluate the credibility of the claimant; and (3) the Appeals Council wrongly rejected the additional medical evidence submitted.  (Pl. Br. 8, 15, 17.)

## II.   EVIDENCE BEFORE THE ALJ

At the hearing before the ALJ, plaintiff testified about his impairments, treatment history, daily life, and work ability.  (R. 56-86.)  The ALJ also received and reviewed the opinions and reports from various doctors about plaintiff's physical and mental limitations.  (R. 87-438.)

A.  Non-Medical Evidence.

Plaintiff was 48 years old at the time of his application for benefits.  (R. 88.)  He stopped attending school in 1978 during the ninth grade.  (R. 59.)  Plaintiff has no reported income or work since 1995.  (R. 62.)  He testified that he was homeless for ten years and collected cans in order to support his $100 a day drug habit.  (R. 63.)  Ayala currently abstains from illegal drug use with a daily dose of Methadone.  (R.64.)  Plaintiff resides alone in a $250-per-month apartment in the Bronx.  (R.65.)  The New York City Human Resource Administration sent him to the "Work Experience Program" but he stopped going in 2009.  (R.66.)  He testified he has not looked for work since then because of his "bad back and left leg."  (Id.)  When asked why he could not perform a sedentary job, plaintiff asserted he was getting old and did not want to take instructions from young people.  (R. 81.)  Plaintiff was 50 at the time of the hearing.

Ayala is capable of using public transportation, which he frequently takes to get to his medical exams.  (R.76.)  Each morning, he travels to his 8:30 a.m. appointment in order to obtain Methadone.  (R.78.)  After picking up the Methadone, plaintiff attends a program at Common Ground and then goes home to take care of his cat, read the newspaper, and watch a movie.  (R. 79-80.)  He also goes to the store twice a week and does light cooking.  (R. 75-76.)

Plaintiff also testified about his self-reported physical limitations: he cannot lift more than ten pounds, walk more than five blocks, or stand for more than one hour.  (R. 70-71.)  Plaintiff was capable of carrying a five pound bag to the hearing.  (R. 60.)  He does not believe he can go more than one week without feeling pain in his leg.  (R. 67.)  Plaintiff denies that he

has any problem sitting. (R. 70.) The ALJ observed plaintiff walk into the hearing room with a cane but plaintiff revealed he was never prescribed a cane by any of his physicians. (R. 70.)

Vocational expert Andrew Vaughn testified at the administrative hearing. (R. 81-85.) Mr. Vaughn was asked whether, hypothetically, there were jobs in the national economy for a person who could perform work at a light exertional level but is limited to: simple instructions; simple, routine, repetitive tasks; no contact with the public; and only occasional contact with supervisors. (R. 82.) The ALJ further modified the job inquiry to a position that had a sit/stand option. (R. 83.) Mr. Vaughn testified there were still job opportunities under those qualifications and listed three examples. (R. 84.) However, when plaintiff's counsel further narrowed the job qualifications, Mr. Vaughn testified that a person would be precluded from holding the positions he referenced if he could neither be off-task fifteen percent of the time nor have three unscheduled absences in a month. (R. 84-85.) Plaintiff's attorney believes the medical evidence supports the conclusion that Ayala has these limitations and therefore would not be able to hold the listed jobs. (Id.)

B. Medical Evidence.

In addition to testimony, the ALJ received medical records. (R. 87-438.) Plaintiff had alleged both physical and mental impairments that rendered him disabled. The physical impairments included his left ankle, lower back pain, and Hepatitis-C. Plaintiff also suffers from Depressive Disorder or possible Bipolar Disorder.

i. Physical Impairment:

Plaintiff alleges he has had problems with his left leg since 1995. (R. 226.) Examining physician, Catherine Pelczar-Wissner, M.D., noticed an "antalgic gait" and that Ayala needed help getting onto the exam table. (R. 228.) During the examination she noted

there were a lot of arthritic changes on the medial side of his foot and both feet appeared to be very flat.  (Id.)  She diagnosed Ayala with "probable arthritis left ankle with abnormal gait and low back pain."  (Id.)  His prognosis was stable with marked restrictions for prolonged standing, walking, climbing stairs and ladders and maneuvering uneven terrain and inclines.  (Id.)  Ayala alleged he had abnormality in L4 and L5 but the tests performed by Dr. Pelczar-Wissner showed his movement was normal and no X-rays or MRI's were done.  (R. 226-228.)

On May 29, 2013, Ayala began seeing Pamela Roberts, Doctor of Podiatric Medicine, at Care for the Homeless.  (R. 385.)  She took X-rays and found that his left foot had bunions, hammertoes, and cellulitis from shooting drugs into his foot.  (R. 380.)  The initial assessment revealed joint pain in the ankle, general osteoporosis,[1] and acquired pes plantus.[2] (Id.)  Dr. Roberts noted that Ayala complained of chronic back pain but there is nothing in her record to show any tests were done or treatment options were explored.  (R. 380.)  Dr. Roberts prescribed Voltaren, a gel to help the swelling, and a brace for plaintiff's ankle.  (R. 68, 381.)  Ayala chose not to wear the brace at first because of the abrasions it caused on his ankle.  (Id.)  On follow up appointments there were no new symptoms or diagnoses beyond the abrasions caused by the brace.  (R. 360, 363.)  Dr. Roberts had Ayala fit for a custom brace to avoid abrasions and prescribed orthopedic shoes.  (R. 362.)

Ayala also suffers from Hepatitis-C but is not experiencing any symptoms.  (R. 210, 420, 422.)  From 2011 to 2013 when he was regularly seen at Bellevue Hospital, his liver scans were routinely normal.  (R. 299-324.)  Doctors prescribed Pegasys as treatment, which

---

[1] Osteoporosis means "porous bone," it is when the bone loses density or mass. Bones become weak and can break easily. NATIONAL OSTEOPOROSIS FOUNDATION, https://www.nof.org/patients/what-is-osteoporosis/. (last visited July 11, 2017).

[2] Also referred to as "acquired adult flatfoot deformity," pes plantus is the gradual flattening of the arch of the foot. AMERICAN ORTHOPAEDIC FOOT & ANKLE SOCIETY, http://www.aofas.org/footcaremd/conditions/ailments-of-the-midfoot/Pages/Acquired-Adult-Flatfoot-Deformity.aspx. (last visited July 11, 2017).

Ayala continues to take.  (R. 205.)  Ayala never complained of any acute distress and denied any pain at these visits. (R. 239, 240.)

ii. Mental Impairment:

Ayala had an appointment with Charles Schwartz, M.D., a board certified psychiatrist at Care for the Homeless on June 12, 2012, for a psychiatric assessment.  (R. 295.) Dr. Schwartz noted that Ayala had poor attention, distractibility, choppy speech, a mildly agitated mood, and diagnosed him with Depressive disorder.  (Id.)  Ayala saw Dr. Schwartz again on October 4, 2012, and appeared to be more depressed since stopping his Hepatitis-C treatment in August.  (R. 292.)  It was thought a possible cause of his depressive symptoms might have been caused by the gap in his Hepatitis C treatment.  (R. 292.)

Dr. Schwartz found it hard to gauge Ayala's self-reported depression because he seemed to give different answers.  (R.293.)  On his PHQ-9 screening he received a total score of 26 indicating severe depression, but "he appears far less depressed and only rates himself as mildly depressed on a scale of 1-10."  (R. 292.)[3]  Ayala went to Dr. Schwartz one more time to get an evaluation for SSI but saw Licensed Clinical Social Worker, Lynnette Verges instead.  (R. 290.)  Ayala's symptoms were reported to be consistent from the last time he was seen by Dr. Schwartz.  (Id.)  Dr. Schwartz's examination of Ayala was conducted before the time period in which plaintiff claimed to be disabled.  Dr. Schwartz even indicated a possible cause of his depressive symptoms might have been due to a gap in treatment for his Hepatitis-C.  (R. 292.)

_____

[3] The Patient Health Questionnaire (PHQ-9) is a self-administered tool for assessing depression.  The test incorporated DSM-IV depression criteria as well as other major depressive symptoms into one report. This report is commonly used for screenings and diagnoses and in recent studies has been found to be reliable and internally consistent. AMERICAN PSYCHOLOGICAL ASSOCIATION, http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health.aspx. (last visited July 11, 2017).

On January 22, 2013, Melissa Antiarin, Psy. D., examined Ayala at the request of the SSA. (R. 221-25.) Dr. Antiaris had Ayala complete counting, simple calculations, serial 3's, and recall items over time in order to test his memory, attention, and concentration. (R. 223.) She found plaintiff's attention was mildly impaired due to limited intellectual functioning but he could follow and understand simple instructions, learn new tasks, and perform simple tasks independently. (Id.) The major problem, according to Dr. Antiaris, was that plaintiff could not properly deal with stress and his difficulties were caused by a lack of motivation. (Id.) However, his inability to "deal with stress [did] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (R. 224.) She diagnosed Ayala with depressive disorder and polysubstance dependence. (R.223.)

A state agency psychological consultant, T. Inman-Dundon, Ph.D., reviewed the record from Dr. Antiaris's examination of Ayala. (R. 94.) He found the evidence supported no more than moderate limitations among categories including: accepting instructions from supervisors, responding appropriately to change, and interacting with the general public. (R. 94.) These limitations also are in line with those listed by Dr. Antiaris. Even though Dr. Inman-Dundon opined that Ayala was not disabled, the ultimate fact finding is left to the ALJ. (R. 96); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

Ayala began seeing Isaac Bampoe, M.D., a board-certified psychiatrist from Care for the Homeless, as his treating physician on May 9, 2013. (R. 384.) Dr. Bampoe examined Ayala and found he had a depressed mood with anxious effect, denied suicidal ideations, poor recent memory, fair insight, fair judgment, and tenuous impulse control. (R. 385.) Ayala scored a 50 on the GAF scale and was diagnosed with Major Depressive Affective Disorder.[4] (R. 386.)

---

[4] "Global Assessment of Functioning" measures an individual's psychological, social and occupational impairments but does not consider physical or environmental limitations. A score of 50 indicates serious symptoms or a serious

At a follow-up appointment one week later, Dr. Bampoe diagnosed Ayala with both Attention Deficit Hyperactivity Disorder and Bipolar I Disorder and prescribed him 300mg of Lithium to take twice daily.  (R. 383.)

On June 20, Ayala reported to Dr. Bampoe that the Lithium was making him calmer, more in control, and that he had fewer racing thoughts.  (R. 377.)  Dr. Bampoe assessed Ayala's mood to be fine with appropriate affect, an improvement from the pre-Lithium visit. (Id.)  At his July 25 visit, it was reported he was negative for depression, sleep disturbances, loss of appetite, suicidal ideations, and delusions.  (R. 372.)  Ayala did have symptoms of anxiety. *Id*. His GAF score improved to 55.  (Id.)  By his August 26 visit, he had the same negative symptoms as July 25, but also had no anxiety, mood swings or irritability.  (R. 365.)  Over the next six months at follow-up appointments Ayala reported he felt better and more in control when he was on Lithium.  (R. 361, 371.)  In one instance, plaintiff had run out of Lithium and noticed an increase in his levels of agitation and a decrease in his ability to focus. (R. 371.)  This indicated the Lithium was likely effective in regulating his depressive symptoms.

On December 5, 2013, Dr. Bampoe reported that Ayala still had moderate psychomotor agitation but did not find it to be disabling or to interfere with functioning.  (R. 357.)  His mood was fine with appropriate affect and he continued to be negative for depression and other symptoms.  (R. 358.)  On March 3, 2014, Dr. Bampoe re-assessed Ayala and maintained his dosage of Lithium.  (R. 356.)  He noticed Ayala was fidgety, easily distracted, and his mood was fine with normal range of affect.  (Id.)  After nearly a year of seeing Ayala, Dr. Bampoe noticed no drastic change in his symptoms; there was no period of decompensation

---

impairment in functioning (i.e. unable to keep a job) A score of 55 indicates moderate symptoms or moderate difficult in functioning. GLOBAL ASSESSMENT OF FUNCTIONING, NEW YORK STATE, OFFICE OF MENTAL HEALTH.https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf.  (last visited June 26, 2017).

noted in his record. Again, it appears that the Lithium was effective in helping treat Ayala's symptoms.

Dr. Bampoe completed a boilerplate Psychiatric Impairment Questionnaire on April 21, 2014, from plaintiff's counsel Binder & Binder. (R. 412-18.) Dr. Bampoe indicated Ayala's current GAF was 60, an improvement from his lowest score of 50. (R. 412.) Some of Dr. Bampoe's clinical findings included poor memory, mood disturbance, difficulty thinking or concentrating, hostility and irritability. (R. 413.) He believed Ayala was incapable of even a low-stress work environment because he is easily overwhelmed and has low frustration tolerance. (R. 418.) However, Dr. Bampoe indicated that his prognosis is fair with treatment. (R. 412.)

### iii. New Medical Evidence

Counsel for Ayala offered new medical evidence to the Appeals Council. This evidence included a letter from Dr. Bampoe dated April 8, 2015. (R. 8.) The letter reaffirmed Dr. Bampoe's opinion from his April 21, 2014 assessment of Ayala. (R. 8, 412-418.) In his current letter, Dr. Bampoe added that he does not believe Ayala would be able to maintain employment in a full-time competitive working environment. (R. 8.) However, on his January 15, 2015, assessment of Ayala there did not appear to be any significant changes: he was negative for symptoms of depression, anxiety, high stress level, sleep disturbance, and mood swings. (R. 21.)

Additional medical evidence included a Mental Impairment Questionnaire and a letter completed by Robert Lloyd Goldstein, M.D. (R. 9-17.) Dr. Goldstein saw Ayala on November 14, 2014, reviewed his medical records and did a one-time evaluation. (R. 9-13.) Ayala's symptoms included depressed mood, hostility or irritability, difficulty thinking or

concentrating, poor recent memory, impulsive or damaging behavior, etc. (R. 10.) He believes Ayala has "marked restrictions" in remembering work-like procedures, understanding detailed instructions, performing activities in a schedule, etc. (R. 12.) Dr. Schwartz opined that Ayala was "totally disabled and unable to work" and the onset of his disability was September 24, 2011. (R. 13.) Dr. Schwartz states "[Ayala's] response to the treatment [lithium] has not been favorable and he continues to be highly unstable." (R. 16.) He asserts that Ayala's GAF score is 45. (R. 17.)

Ayala also offered continued treatment records from his treating podiatrist, Dr. Roberts. (R. 25.) She noted that he was not wearing his custom ankle brace and that it must be worn with the orthopedic shoe. (R. 20.) Dr. Roberts gave Ayala a new prescription for orthopedic shoes. (R. 25.)

III.    Applicable Law

A.  Standard of Review.

Under Rule 12(c), Fed. R. Civ. P., the movant bears the burden of establishing "that no material issue of fact remains to be resolved and that [movant] is entitled to judgment as a matter of law." <u>Juster Assocs. V. City of Rutland, Vt.</u>, 901 F.2d 266, 269 (2d Cir. 1990) (citations omitted) (alteration in original). When reviewing a Social Security claim, the court does not determine <u>de</u> <u>novo</u> whether the plaintiff is disabled and entitled to benefits. <u>See</u> <u>Schall v. Apfel</u>, 134 F. 3d 496, 501 (2d Cir. 1998). Rather, the reviewing court determines only "whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" <u>Id.</u> (quoting <u>Beauvoir v. Charter</u>, 104 F. 3d 1432, 1433 (2d Cir. 1997)); <u>see also</u> <u>Rosa v. Callahan</u>, 168 F. 3d 72, 77 (2d Cir. 1999) (explaining a court will set aside an ALJ's decision only when it is based upon "legal error" or "not supported by substantial evidence") (internal quotation marks omitted).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). However, "[i]n conducting [its] review . . . [the court] will not substitute [its] own judgment for that of the Commissioner, even if [it] might justifiably have reached a different result upon de novo review.'" Campbell v. Astrue, 465 Fed. Appx. 4, 5 (2d Cir. 2012) (summary order) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

B.  Disability Determination

The SSA defines a "disability" as an "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine where a claimant is entitled to disability benefits, the ALJ must follow a five-step sequential analysis. See 20 C.F.R. § 404.1520(a)(1). In this Circuit, the five step process is described as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to

perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa, 168 F.3d at 77 (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). "Until the final step in this process the burdens of production and persuasion remain solely with the claimant." Lopez v. Comm'r of Soc. Sec., 622 Fed. Appx. 59, 60 (2d Cir. 2015) (summary order) (citing Balasamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998)).

IV.   Discussion

A.  The ALJ's decision

After applying the five-step process, the ALJ denied plaintiff's SSI claim. Rosa, 168 F.3d  at 77.  First the ALJ determined the plaintiff has not engaged in substantial gainful activity since November 26, 2012.  (R. 46.)

At step two, the ALJ determined that plaintiff had a severe physical impairment, left ankle pain and sprain.  (R. 46.)  He also had a severe mental impairment and depression.  20 C.F.R. § 416920(c).  The ALJ believed the "longitudinal evidence shows. . .  more than minimal limitation on claimant's ability to perform basic work activities."  (R. 46.)

At step three, the ALJ found the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20 C.F.R. §§ 416.920(d), 416.925 and 416.926.)  Specifically, Ayala has the ability to walk without a walker, canes, or a wheelchair.  Therefore, he does not meet the definition of inability to ambulate effectively under Listing 1.02.  (R. 47.)  In regards to his mental impairment, the ALJ found the plaintiff did not have marked restrictions in two or more categories of "paragraph B" and did not have any episodes of decompensation.  Plaintiff's mental impairment did not meet or medically equal the criteria of Listing 12.04.  (R. 47-8.)

At step four, the ALJ concluded that plaintiff has no past relevant work. 20

C.F.R. § 416.965. (R. 50.) Before considering step five, the ALJ must take into account

claimant's age, education, skills, and other qualities beyond his impairment that will help

determine what jobs he can perform. Rosa, 168 F.3d at 77. The ALJ noted plaintiff was 48, a

younger individual, at the time he filed for SSI. (R. 51.) Plaintiff can speak English, has a

limited education, and few transferrable skills. (Id.)

Finally, the ALJ determined there were a significant number of jobs in the

national economy that the plaintiff can perform. (Id.) The ALJ further restricted the "light

work" options to only jobs the plaintiff would be capable of performing. (Id.) The ALJ imposed

restrictions in accordance with doctors' opinions on the type of job plaintiff could perform: no

climbing ladders, ropes or scaffolds; no using left foot controls; only carrying out simple

instructions and performing simple routines; no contact with the general public; only occasional

contact with a supervisor; and an option to sit for 20 minutes after standing for one hour. (R.

49.) The vocational expert listed jobs that plaintiff would be capable of performing under those

limitations and restrictions. The ALJ concluded the plaintiff is capable of making a successful

adjustment to other work in the national economy and a finding of "not disabled" is appropriate.

(R. 51.)

B. The Treating Physician Rule.

The opinion of a claimant's treating physician about the nature and the severity of

an impairment is entitled to controlling weight as long as it is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence . . . in [the] record." 20 C.F.R. § 404.1527(c)(2); see also Halloran v.

Barnhart, 362 F. 3d 28, 32 (2d Cir. 2004). A treating physician is not afforded controlling

weight when their opinion is not consistent with the substantial evidence. Id. (citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)). A report from a consultative physician may constitute substantial evidence. Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983).

An ALJ who declines to give controlling weight to a treating physician's opinion must provide "good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2); see Aung Winn v. Colvin, 541 Fed. Appx. 67, 70 (2d Cir. 2013) (summary order). Failure to provide good reasons for their decision is grounds for remand. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) (per curiam). Even when a treating physician's opinion is contradicted by substantial evidence and therefore not entitled to controlling weight, it is entitled to some "extra weight." Cruz v. Sullivan, 912 F.2d 8, 12 (2d Cir. 1990). The ALJ must consider various factors to determine how much weight the treating physician's opinion should be given. 20 C.F.R. § 404.1527(c)(2). Factors include frequency of examination, length and nature of treatment relationship, evidence supporting the treating physician's opinion, consistency of the opinion with the record as a whole, and the physician's area of specialization. 20 C.F.R. § 404.1527 (c)(1-6); Halloran, 362 F. 3d at 32. These factors are intended to guide an ALJ's assessment of a physician's opinion, but the ALJ need not expressly address each one. Atwater v. Astrue, 512 Fed. Appx. 67, 69 (2d Cir. 2013) (summary order). The final responsibility for determining whether the claimant's impairment(s) are equal to the requirements in appendix 1 is reserved for the Commissioner, a treating physicians opinion that the claimant is disabled is not controlling. 20 C.F.R. § 404.1527 (d)(2); Snell, 177 F.3d at 133.

i. Physical Impairments

The SSA asked Dr. Catherine Pelczar-Wissner to conduct a physical examination and submit her medical opinion for the record. (R. 226-229.) Her letter stated Ayala had an

antalgic gait, marked restriction for prolonged standing or walking, climbing stairs or uneven terrain, inclines, and climbing ladders. (R. 228.) The ALJ considered these limitations when determining Ayala's RFC. (R. 50, 51, 82.) Dr. Pelczar-Wissner said Ayala's prognosis was stable and did not comment on any work restrictions he may have. (Id.)

After Dr. Pelczar-Wissner's examination, plaintiff began seeing Dr. Pamela Roberts for routine examinations and treatment. (R.362-64.) Dr. Roberts is a Doctor of Podiatric Medicine at Care for the Homeless and specializes in feet. The basis of Ayala's pain was his left ankle and lower back. Tests did not show any restrictions on his mobility and flexibility of his back and ankle. (R. 361-63, 378-79.) Neither Dr. Roberts, Bellevue Hospital, Dr. Bampoe, nor Dr. Antiaris recognize the same "antalgic gait" that Dr. Pelczar-Wissner noted. (R. 285,378-79, 380.) Dr. Roberts diagnosed plaintiff with joint pain, general osteoporosis, and acquired pes planus. (R. 380.) Dr. Roberts prescribed Voltaren, a topical gel, to help with swelling. (R. 381.) She also had a custom brace made and prescribed orthopedic shoes. (R. 362.)

The ALJ had good reason to give controlling weight to treating physician Dr. Roberts and only moderate weight to examining physician Dr. Pelczar-Wissner. (R. 50.) Dr. Roberts' opinion was consistent with Ayala's testimony at his hearing, substantial evidence, and clinical tests. Halloran, 362 F.3d at 32. The ALJ gave little weight to Dr. Pelczar-Wissner's opinion of Ayala's "marked" restrictions because this was a one-time exam that occurred before Dr. Roberts began to examine and treat Ayala's foot. Id.; 20 C.F.R. § 404.1527(c)(2).

The ALJ did not err by giving greater weight to Dr. Roberts and declining to accept the "marked limitations" suggested by Dr. Pelczar-Wissner because they were inconsistent with the record as a whole. 20 C.F.R. § 416.927(c)(3), (c)(4). Further, the ALJ did

limit the physical abilities of plaintiff when instructing the vocational expert to identify any other

work plaintiff could perform.  The ALJ's decision is supported by substantial evidence so it

should be given conclusive effect.  Genier, 606 F. 3d at 49.

ii. Mental Impairments

Before he applied for SSI, Ayala had been treated twice by Charles Schwartz,

M.D., at the Homeless Medical Clinic.  (R. 388, 391.)  At the request of the SSA, Ayala was

evaluated by Dr. Melissa Antiaris and his record was reviewed by Dr. Inman-Dundon.

Seven months after filing for SSI, Ayala started seeing Dr. Bampoe, as a treating

psychiatrist.  (R. 384.)  As a treating physician, Dr. Bampoe's opinion is generally entitled to

controlling weight.  Halloran, 362 F.3d at 32.  However, the ALJ decided not to afford Dr.

Bampoe's is controlling weight for a several stated reasons.  (R. 50.); see also Aung Winn, 541

Fed. Appx. at 70.  The ALJ stated he was giving moderate weight to both examining

psychologist Dr. Antiaris and Dr. Inman-Dundon, a state agency psychological consultant.  (R.

49, 50.)  Plaintiff argues the ALJ erred in choosing to afford the treating physician's opinion

minimal weight.  (Pl. Br. 9.)

The ALJ found that Dr. Bampoe's opinion was not consistent with the record as a

whole.  (R. 49.)  Dr. Bampoe asserted that plaintiff had "marked" restrictions in many categories

where the ALJ believed other medical opinions and Ayala's testimony indicated only "moderate"

restrictions.  (R. 48.)  For example, Dr. Bampoe believed that the plaintiff had marked

restrictions (effectively precluded) in his ability to perform activities within a schedule.  (R.

415.)  However, at trial plaintiff testified that he kept his 8:30 a.m. Methadone appointment

every day, and appeared to keep a very similar routine.  (R. 76-80.)  This indicates, according to

Dr. Antiaris that plaintiff could maintain schedule and did not have "marked restrictions."  (R.

222.) Similarly, Dr. Antiaris, utilizing accepted diagnostic tools, assessed plaintiff's attention and concentration and found that he was only mildly impaired due to his limited intellectual functioning and his lack of motivation. 20 C.F.R. § 404.1527(c)(2); Halloran, 362 F. 3d at 32. (R. 223.) Plaintiff testified he would not take a simple job because "too many young people, they want to tell me what to do" but that he could follow simple instructions. (R. 81). Plaintiff said he would "have difficulty taking orders" but was vague with regard to any reason. (R. 49-50.) These vague statements and unsupported allegations should not be taken as conclusive evidence that effectively proves plaintiff's limitations. Halloran, 362 F.3d at 32 (finding the ALJ recognized "other medical evidence in the record [ ] did not support the vague functional limitations suggested in [the treating physician's] evaluation.") The ALJ appeared to consider the entirety of the record and found the plaintiff's limitations were better categorized as "moderate." (R. 48.)

Substantial evidence, including the inconsistencies, supports the ALJ's decision to not give the treating physician controlling weight. (R. 50.) The ALJ found that Dr. Bampoe's opinion was not supported by the Ayala's own testimony. (R. 49-51.) Although it is improper for the ALJ to substitute his own findings or beliefs about the claimant's disability in place of the treating physician, the substance of the claimant's testimony is part of the body of evidence the ALJ may consider when determining the weight to give to the treating physician. Pirog v. Colvin, No. 15 cv 438 2016 WL 5476006, at *4 (S.D.N.Y. 2016); see also Stevens v. Barnhart, 473 F. Supp. 2d 357, 364 (N.D.N.Y. 2007). The ALJ determined that the claimant's testimony and medical evidence did not support a finding that plaintiff was disabled. 20 C.F.R. § 404.1527 (d)(2); Snell, 177 F.3d at 133.

The ALJ considered different factors, although not explicitly, when determining how much weight Dr. Bampoe's opinion should receive. 20 C.F.R. § 404.1527 (c)(1-6); Halloran, 362 F. 3d at 32. First, Dr. Antiaris is a Doctor of Psychology ("Psy. D.") and "has significant training and experience in disability evaluations according to the Social Security disability program rules." (R. 50.) Dr. Bampoe does not have the same training.

Second, Dr. Bampoe's opinion was internally inconsistent and inconsistent with the medical record as a whole. (R. 50.) At each visit Ayala indicated the Lithium was improving his concentration and his mood which is not indicated in Dr. Bampoe's Psychiatric Impairment Questionnaire dated April 21, 2014. (R. 361, 371, 412.) Although Ayala did show signs of psychomotor agitation, it did not interfere with his ability to function. (R. 357.) In another inconsistency, Ayala reported no longer having hallucinations or delusions after he stopped using drugs. (R. 384, 389, 392.) However, in Dr. Bampoe's opinion dated April 21, 2014, Ayala's "primary symptoms" included agitation, suicidal thoughts, poor concentration, delusions, and hallucinations. (R. 414.) This is not supported by Ayala's testimony before the ALJ and his statements to Dr. Antiaris. These were factors considered when determining the weight to accord to the treating physician and examining physician. (R. 50.) 20 C.F.R. § 404.1527 (c)(1-6); Halloran, 362 F. 3d at 32. The ALJ committed no error in assigning Dr. Bampoe's opinion little weight. There is substantial evidence to support the ALJ's assessment of the proper weight to be given Dr. Bampoe's opinion. Even if there is some evidence supporting a contrary finding, it is not the job of this Court to weigh the evidence de novo. Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam).

Plaintiff argues that Dr. Inman-Dundon, non-examining psychologist, did not have the entire record and therefore his opinion should only receive little, if any weight. (Pl. Br.

13); <u>Rodriguez v. Astrue</u>, No. 07 cv 534 (WHP)(MHD), 2009 WL 637154 *26 (S.D.N.Y. 2009);

<u>Velazquez v. Barnhart</u>, 518 F. Supp. 2d 520, at 524 (W.D.N.Y. 2007) (finding that "an opinion

based on personal examination is inherently more reliable than an opinion based on review of a

cold, medical record."). While the ALJ does cite Dr. Inman-Dundon's statement that "claimant

could perform complex and simple tasks," the ALJ specifically limited the RFC to simple

instructions and performing simple, routine, repetitive tasks. (R. 49.) This limitation is in line

with both Dr. Bampoe's and Dr. Antiaris's opinions. (R. 415.)

              iii. The ALJ followed the appropriate procedure for weighing the
                   evidence of Mental Impairments.

Plaintiff asserts the ALJ erred by not giving extra weight to a treating physician's

evaluation of a mental impairment. (Pl. Br. 12-13.) The Commissioner requires an ALJ to

document application of the "special technique" used to evaluate mental impairments, and

include a specific finding with respect to the degree of limitation in each of four broad functional

areas: activities of daily living, social functioning, concentration, persistence, or pace, and

episodes of decompensation. <u>Kohler v. Astrue</u>, 546 F.3d 260, 261 (2d Cir. 2008);

20 C.F.R. §§ 404.1520a(c)(3), 404.1520a(e)(4), 416.920a(c)(3), 416.920a(e)(4).

The ALJ's decision explicitly shows he used "paragraph B" to evaluate the mental

impairment of claimant at step three of the five-step sequential evaluation process. To satisfy

"paragraph B," a claimant must show that his impairments result in at least two of the following:

"marked restriction of activities of daily living; marked difficulties in maintaining social

functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated

episodes of decompensation, each of extended duration." (R. 47.) The ALJ found that Ayala

had "no restrictions" in regard to activities of daily living. (<u>Id.</u>) Ayala testified and told Dr.

Antiaris that he was able to use public transportation alone and was "basically self-sufficient."

(Id.)  Ayala has "moderate difficulties" in regards to his social functioning.  (Id.)  This determination was based on Ayala's demeanor at the hearing and his answers to Dr. Antiaris's questions. (R. 48.)

With regard to concentration, persistence or pace the ALJ determined Ayala had "moderate difficulties."  (Id.)  Based on the observations of Dr. Antiaris and Ayala's own testimony the ALJ felt there was not enough evidence to support Dr. Bampoe's "marked restriction" in this category.  (Id.)  There were no episodes of decompensation during the alleged period of disability, the record is clear of any indication of hospitalization based on mental illness.  (Id.)  Because there are not two categories of marked restrictions or one category of marked restrictions and episodes of decompensation, "paragraph B" is not satisfied. 20 C.F.R. § 404.1520a(c)(3).

In making determinations about Ayala's restrictions the ALJ gave moderate weight to Dr. Antiaris's opinion, little weight to Dr. Bampoe's opinion, and used his own observations of the claimant at the hearing.  In doing so, the ALJ correctly followed the step-by-step procedure and explained his process.  Kohler, 546 F. 3d at 261.

C.  Credibility Determination.

The credibility of Ayala was not a central focus of the hearing or the ALJ's findings.  The ALJ found the testimony of his alleged symptoms and limitations to be "only partially credible."  (R.50.)  The ALJ noted that Ayala's statements about the intensity, persistence and limiting effects of pain or other symptoms were not substantiated by the objective medical evidence.  (R. 49.)

The ALJ, not the reviewing court, has the responsibility to determine the credibility of the witnesses.  Courts "must show special deference" to "explicit credibility

findings." <u>Yellow Freight Sys.</u>, 38 F.3d at 81; <u>see also</u> <u>Snell</u>, 177 F.3d at 135 ("After all, the ALJ is in a better position to decide issues of credibility."). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186 at *1-2. "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." <u>Id.</u> at *4.

 The regulations set out a two-step process for this credibility determination. Initially, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." <u>Snell</u>, 177 F.3d at 135 (citing 20 C.F.R. § 404.1529(b)). Then, if the ALJ determines that the claimant suffers from an impairment, "the ALJ must consider the extent to which the claimants symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." <u>Snell</u>, 177 F.3d at 135 (citing 20 C.F.R. § 404.1529(a)).

 First, the ALJ determined that Ayala suffers from medically determinable impairments that could reasonably be expected to cause the alleged symptoms. (R. 50.) However, second, the ALJ found Ayala's statements and testimony concerning the limiting effects of his symptoms to be only "partially credible." (R. 50.) The ALJ determined credibility based on several factors including Ayala's testimony at the hearing and that his self-proclaimed limitations were inconsistent with tests Dr. Roberts ran during her examination. (R. 46.)

 During the hearing, Ayala was questioned by his own attorney in an effort to establish the fundamental premise on which his claim was based: that he was incapable of

working because of his disabilities. However, Ayala contradicted his own claim and supported a contrary conclusion that he "just got tired of working." (R. 81.)

> Q. If somebody offered you a simple job where you're able to sit all day and not very hectic, do you think you'd be able to do that?
> A. I don't know. I don't think I would take it.
> Q. Why?
> A. I don't know. I'm getting old. You know. Too many young people, they want to tell me what to do.
> Q. If somebody gave you instructions to do a job, would you be able to follow them?
> A. Of course. I followed that – in one place I worked there eight years.
> Q. Okay. I don't have any –
> A. Then I just got tired of working.
> Q. I don't have any further questions.

(R. 81.)

The ALJ also observed that Ayala arrived at the hearing with a cane but admitted that no doctor told him he needed a cane. (R. 70, 47.) He brought a foot-boot to the hearing that had been prescribed to him but on questioning he conceded that he does not wear it much because it hurts. (R. 69.) He testified that he had special sneakers that helped with pain except when it rained. (R. 67.) He admitted that he was prescribed an anti-inflammatory medication for that pain, Voltaren, but stopped using it after "like a month" because "it doesn't work. It doesn't even sting." (R. 68.) The ALJ pointed out that the medication was not supposed to sting but help with swelling and pain, Ayala agreed but said it was no help. (R. 68.)

The ALJ concluded that Ayala had "dishonestly" failed to report earnings for recycling collected cans. (R. 50.) While the ALJ's findings do not dwell further on the point, the transcript reflects there was more than ample basis for the ALJ's conclusion. Ayala testified that until 2007 he had a $100-a-day heroin and cocaine habit. (R. 63.) He claimed that for nine years he supported this habit by "scrapping cans." (R. 63.) He further testified that he began taking prescribed methadone about a year before the hearing. (R. 65.) With understandable

skepticism about whether Ayala had supported this expensive drug habit solely on recycled cans, the ALJ pressed him whether he was also selling drugs. Ayala was evasive and equivocal:

> Q. So since 2007, when you had a $100 a day habit, were you also selling
> drugs? I'm just trying to figure out how you supported yourself?
> A. Not really. But they said I was selling. No.
> Q. Oh, you were accused of selling?
> A. Yeah. Yeah.
> Q. But they got it wrong? Okay.
> A. Maybe, yeah.

(R. 65.)

To reiterate, Ayala testified to very little at the hearing that actually supported his claim. To the extent that his appearance was an endorsement of the statements he made in his application for benefits, the ALJ was best-positioned to assess the credibility of Ayala. The ALJ's findings were sufficiently explicit and consistent with evidence in the record. Carroll v. Sec'y of Health & Human Servs., 705 F. 2d 638, 642 (2d. Cir. 1983); Yellow Freight Sys., 38 F. 3d at 81.

### D. New Medical Evidence not Reviewed by Appeals Council

Plaintiff contends the ALJ's conclusions are not supported by substantial evidence in light of the new medical records submitted to the Appeals Council. (Pl. Br. 17-19). On review, the Appeals Council must consider new and material evidence that is submitted where it is "related to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 416.1470(b); see also Perez v. Chater, 77 F.3d 41, 44 (2d Cir 1996) ("Social Security regulations expressly authorize a claimant to submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision."). When new evidence is submitted it becomes part of the administrative record. Id. at 45. The Appeals Council reviews the evidence and only considers the evidence if it is, (1) material, (2) related to the period on or before the

ALJ's decision, and (3) if the [ALJ's] decision is contrary to the weight of the evidence currently of record. 20 C.F.R. § 416.1470(b); see also Rutkowski v. Astrue, 368 Fed. Appx. 226, 229 (2d Cir. 2010). "If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision." Lesterhuis v. Colvin, 805 F.3d 83, 83 (2d Cir. 2015) (citing Perez, 77 F.3d at 44). When reviewing a final decision of the SSA, a district court must "review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary." Id.; see also Perez, 77 F.3d at 46.

On appeal plaintiff supplemented his claim with: (1) a letter from Dr. Bampoe dated April 8, 2015; (2) additional treating records from Dr. Bampoe and Dr. Roberts dated October 21, 2014 to January 2, 2015; (3) a Mental Impairment Questionnaire completed by Dr. Robert Goldstein on November 11, 2015; and (4) the medical opinion of Dr. Goldstein dated January 2, 2015. (R. 5-31.) The Appeals Council found the new evidence did not provide a basis for changing the ALJ's decision. (R. 3.)

The letter from Dr. Bampoe dated April 8 (R. 8.) restates his position from a June 4, 2012, Psychiatric Impairment Questionnaire. (R. 412-19.) The information in the letter is not "new" medical evidence; it is "merely cumulative" of what the record already contains in the many reports from Dr. Bampoe as well as his "Impairment Questionnaire." Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988); (R. 353-58, 361-62, 364-65, 367-68, 371-72, 376-78, 381-383, 412-19.) Therefore, the Appeals Council acted appropriately in considering the letter as cumulative and not new medical evidence.

The new treatment notes from Care for the Homeless dated October 21, 2014 through February 11, 2015 do not relate to the relevant time period and need not be considered

by the Appeals Council. (R. 3, 19-35.) 20 C.F.R. § 416.1470(b). The treatment notes are specific to the observations at each examination. Even if the Appeals Council were to consider these treatment notes, Dr. Bampoe's July 23, 2014 report states, "[Ayala] continues to function well on his current medication regiment." (R. 433.)

Similarly, the Mental Impairment Questionnaire and Dr. Goldstein's letter postdate the ALJ's decision. (R.9-17.) The plaintiff argues Dr. Goldstein's report suggests the onset of his disability was prior to September 24, 2011 and therefore does relate to the period before the ALJ's decision. (R.17) (Pl. Br. 18.) However, even if the evidence was relevant it is not of sufficient weight or importance to make the ALJ's decision contrary to the weight of evidence. Rutkowski, 368 Fed. Appx. at 229.

Dr. Robert Goldstein is not a treating physician and therefore his views are not entitled to controlling weight. Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989) (citing Mongeur v. Heckler, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) ("the opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.")). Dr. Goldstein examined Ayala once after the relevant time period and was provided with the medical records. (R. 9-13.) He opines that the plaintiff's response to treatment has not been favorable and his prognosis is poor, yet that directly contradicts with Dr. Bampoe's findings and Ayala's own testimony. (R. 16, 361, 371.) Dr. Goldstein also suggests that Ayala's GAF score is 45 but the last time his score was measured it was 60. (R. 17, 412.)

The Mental Impairment Questionnaire completed by Dr. Goldstein on November 11, 2014 is inconsistent with the greater weight of the medical evidence in the record before the

ALJ. The Questionnaire does not speak to the period at issue and does not render the ALJ's decision contrary to the weight of the relevant evidence.

Accordingly, the Appeals Council did not erroneously disregard new medical evidence. The evidence offered did not relate to the period in question, was not material, and did not make the ALJ's decision contrary to the weight of evidence. <u>Perez</u>, 77 F.3d at 44.

CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the pleadings (Dkt. No. 11) is GRANTED, and plaintiff's cross-motion for judgment on the pleadings (Dkt. No. 13) is DENIED. The Clerk is directed to enter final judgment for the defendant and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      August 16, 2017